**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.C.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.D.R., SR. AKA C.D.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1048 EDA 2019 |

Appeal from the Decree Entered March 7, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-AP-0000929-2018

BEFORE:   OTT, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED OCTOBER 02, 2019**

C.D.R. ("Father") appeals from the decree entered March 7, 2019, which involuntarily terminated his parental rights to his minor child, C.C.R., a female born in August 2017 ("Child"), pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), and 2511(b).[1]  On appeal, Father contends the juvenile court abused its discretion by demonstrating bias in its judgment where the court had previously involuntarily terminated his rights to Child's other siblings.  After careful review, we affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1]  Child's mother, W.H., is not a party to this appeal.  The juvenile court also terminated her parental rights by a separate decree on March 7, 2019, and she did not file an appeal.  ***See*** Department of Human Services's Brief at 3 n.1.

The facts and procedural history underlying this appeal are well-known to the parties, and detailed in the juvenile court's opinion. *See* Juvenile Court Opinion, 5/16/2019, at 2-14. Accordingly, we need not reiterate them herein. In summary, the Department of Human Services ("DHS") has been involved in Child's life since two weeks after her birth. Child was born at 30 weeks gestation, weighed 4 pounds, 12 ounces at the time of birth, and required hospitalization for a kidney disorder. It was also indicated that the court previously involuntarily terminated the parental rights of Mother and Father with respect to Child's four other siblings, and Father had a history of substance abuse. Upon Child's discharge from the hospital on October 10, 2017, she was placed in a foster home and DHS obtained an order of protective custody. At the conclusion of a hearing on January 23, 2018, Child was adjudicated dependent.[2] Several permanency review hearings and a family service plan meeting were subsequently held. On November 20, 2018, DHS filed petitions for involuntary termination of parental rights and goal change to adoption with respect to both parents. On March 7, 2019, at a goal change/involuntary termination hearing, the juvenile court heard testimony from: (1) Barbara Forrest, a social worker for DHS; (2) Dr. William Russell, an expert in forensic psychology and parenting capacity; (3) Arielle Fonrose,

_____

[2] The court also entered an order, finding aggravated circumstances existed as to Mother and Father pursuant to 42 Pa.C.S. § 6302(5) ("The parental rights of the parent have been involuntarily terminated with respect to a child of the parent."). *See* Aggravated Circumstances Order, 1/23/2018.

a social worker at The Village, a foster care service; and (4) Father. At the conclusion of the hearing, the court involuntarily terminated both Mother's and Father's parental rights, and changed the permanency goal to adoption. A decree and order was entered on the same day reflecting the court's determination. On April 5, 2019, Father filed this notice of appeal as to the decree terminating his parental rights.[3]

Father now raises the following issue for our review: "Did the [juvenile c]ourt abuse its discretion by involuntarily terminating Father's parental rights by demonstrating bias in its judgment – having previously involuntarily terminated Father's rights to [Child]'s siblings?" Father's Brief at 6.

When considering an appeal from an order terminating parental rights, we are guided by the following standard.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

---

[3] Father also filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) on April 5, 2019. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on May 16, 2019.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks

omitted).

Termination of parental rights is governed by Section 2511 of the

Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent.  The party
> seeking termination must prove by clear and convincing evidence
> that the parent's conduct satisfies the statutory grounds for
> termination delineated in Section 2511(a).  Only if the court
> determines that the parent's conduct warrants termination of his
> or her parental rights does the court engage in the second part of
> the analysis pursuant to Section 2511(b): determination of the
> needs and welfare of the child under the standard of best interests
> of the child.  One major aspect of the needs and welfare analysis
> concerns the nature and status of the emotional bond between
> parent and child, with close attention paid to the effect on the child
> of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

As noted above, the court terminated Father's parental rights pursuant

to Sections 2511(a)(1), (2), and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may
> be terminated after a petition filed on any of the following
> grounds:
>
> > (1) The parent by conduct continuing for a period of at least
> > six months immediately preceding the filing of the petition
> > either has evidenced a settled purpose of relinquishing
> > parental claim to a child or has refused or failed to perform
> > parental duties.
> >
> > (2) The repeated and continued incapacity, abuse, neglect
> > or refusal of the parent has caused the child to be without
> > essential parental care, control or subsistence necessary for
> > his physical or mental well-being and the conditions and
> > causes of the incapacity, abuse, neglect or refusal cannot or
> > will not be remedied by the parent.

…

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), and (b). Moreover, we note that while the court may find that DHS met its burden of proof under multiple sections, "we need only agree with its decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

Turning to the present matter, Father frames his argument in terms of judicial bias because the court presided over other dependency proceedings involving Father's other children. However, a review of the record, including the March 7, 2019, hearing, reveals that neither Father nor his counsel asked for the presiding judge to recuse himself from the matter. Accordingly, Father has waived any challenge to potential judicial bias or the appearance of impropriety on the court's part in this proceeding. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.")

Moreover, after an extensive review of the record, the briefs of the parties, the applicable law, and the well-reasoned decision of the Honorable Allan J. Tereshko, we conclude Father's issue merits no substantive relief. ***See*** Juvenile Court Opinion, 5/16/2019, at 17-27 (finding: (1) Father failed to meet certain objectives set in his family service plan meetings, including attending family school and a parenting capacity evaluation as well as undergoing drug screens and assessment; (2) Father failed to attend all but one of Child's 32 medical appointments, which were critical because of Child's significant health issues; (3) there were aggravated circumstances because Child's four other siblings had been under DHS supervision and Father's rights had been involuntarily terminated; (4) "Father tended to minimize any difficulties that his children had and believed they did not have disorders or disabilities;"[4] (5) "Father's conduct for at least the six months prior to the filing of the petition to terminate, revealed a settled purpose relinquishing

---

[4] Juvenile Court Opinion, 5/16/2019, at 23. The court also noted:

> The lack of understanding on the part of the parents as to why the [c]hildren came into care effects their ability to integrate any feedback into their parenting skills. That is crucial because [Child], now presents with more special needs than any of the other [c]hildren, and there has not been any significant change in those same areas and that is very concerning. The parents were receptive to the verbal feedback, however, how much they incorporated into their visits was very limited.

***Id.***

parental claim to the Child and revealed a failure to perform parental duties;"[5]

(6) "Father lacks the present and future capacity to provide parental care, control or subsistence necessary for the Child's physical and mental well-being" as he "cannot provide for the Child's basic needs nor can he provide a structured environment for this one and one-half year old Child;"[6] and (7) it is in Child's best interest to terminate the parental rights as Father has minimal contact with Child, she will not suffer detrimental harm, and Child is bonded and happy with her foster parent, and all of her needs, including medical, physical, and emotional, are being met by foster parent). Accordingly, we affirm on the basis of the juvenile court opinion.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/2/19

---

[5] *Id.* at 24.
[6] *Id.*

THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY
IN THE COURT OF COMMON PLEAS

| | |
|---|---|
| IN THE INTEREST OF | : FAMILY COURT DIVISION |
| | : JUVENILE BRANCH-DEPENDENCY |
| | : |
| C.C.R., a Minor | : CP-51-AP-0000929-2018/CP-51-DP-0002701-2017 |
| | : |
| | : |
| APPEAL of: | : Superior Court# 1048 EDA 2019 |
| C.D.R., Sr., Father | : |

## OPINION

C.D.R., Sr., ("Father"), appeals from the Decree and Order entered by this Court on March 7, 2019, granting the Petition to Involuntarily Terminate his Parental Rights and Change the Permanency Goal to Adoption for the Child, C.C.R., a female, born on August 31, 2017, filed by the Department of Human Services ("DHS"), on November 20, 2018, and served on all parties.

In response to the Decrees of Involuntary Termination of Parental Rights and Goal Change issued on March 7, 2019, by this Court, Father, by and through his counsel, filed on April 5, 2019, only one Notice of Appeal with Statement of Matters Complained of Upon Appeal to the Involuntary Termination Decree.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In his Statement of Matters Complained of on Appeal, Father states that the Trial Court erred in the following respect:

1. Father challenges the involuntary termination of his parental rights based on the trial court's abuse of discretion in that its judgment was based on bias— having previously involuntarily terminated Father's rights to C.R.'s siblings.

1

## PROCEDURAL HISTORY:

This family has been known to the Department of Human Services (DHS) due to the failure of the Children's parents, Mother, W.H. and Father, C.D.R., Sr., to provide their Children with adequate food and safe, appropriate housing as well as Father's substance abuse and Mother's mental health problems. Two of this Child's siblings, C.H., and C.R, were diagnosed with neurofibromatosis, a genetically-inherited disorder, and Mother and Father did not ensure that they received appropriate medical care. Furthermore, they did not ensure that the Child, C.R., who was born on May 28, 2013, was tested to determine if he also suffered from neurofibromatosis. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "a").

On approximately September 10, 2012, after several unsuccessful attempts, Mother allowed DHS into the home while Mr. Reed was not present. DHS observed that there were exposed wires, extension cords in the kitchen, unsafe bunkbeds, and unsafe heaters. C.R., a sibling, was found in a car seat on the floor surrounded by clothing, C.R., another sibling, was found with a blender blade in her mouth, and C.H., another sibling, was found with a screw in his mouth. Mother and Father continue to reside in this home to date. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "b").

Over the course of 36 months, Mother attended Family School, but she continued to have difficulty meeting the Children's basic needs. Father refused to cooperate with services and treatment, and refused to allow DHS to enter the home again without his presence. Mother and Father's three older children were committed to DHS on

2

November 9, 2012, and adjudicated Dependent on November 9, 2012. Mother and Father's other child was committed to DHS on August 28, 2013, and adjudicated Dependent on November 4, 2013. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "c").

On June 24, 2014, Assessment & Treatment Alternatives, Inc. (ATA), completed a Parenting Capacity Evaluation (PCE) for Mother, and she was diagnosed with Persistent Depressive Disorder (Dysthymia). There were several issues noted that interfere with Mother being able to provide both safety and permanency to her Children. These barriers include a minimization of the role she played in the situation which precipitated the involvement of DHS and the inability to acknowledge her Children's behavioral problems. Mother also minimizes Father's substance abuse. Mother has neglected to take responsibility for her actions and projected blame on the City for the removal of her Children. Mother also denied all allegations that her home was unkempt, chaotic, and that her Children were not up to date with their immunizations. It was noted that Mother appears to be functioning in the borderline range of intelligence, and does not function well in situations that are, or become, complex. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "d").

On July 15, 2014, ATA completed a PCE for Father. During the interview, Father tended to get defensive, preoccupied, and at times perseverate when confronted with the inconsistency of his answers. Father's hostility, alleged substance abuse and his relationship with the Children's Mother are issues for which he would have benefited from counseling if he had participated. Father minimizes the role he played in the

3

situation which precipitated the involvement of DHS and failed to acknowledge any of DHS concerns and indicated the reason his children were removed was due to false allegations regarding safety hazards in the home. Father failed to recognize any behavioral problems with his Children, stating just that they are hyperactive. It was noted that there are concerns regarding the parents failing to take their Children to medical appointments. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "e").

On February 26, 2015, ATA completed a PCE for Mother, who was diagnosed with Intellectual Disability, Mild, as she is functioning in the borderline range of intelligence. During the interview, she expressed her desire to have her Children returned to her care, however, there continues to be substantial barriers that interfere with her ability to provide safety and permanency to her children. These barriers include a minimization of the role she and Father played in the situation which precipitated DHS' involvement and the inability to acknowledge her Children's behavioral problem/special needs. There is an ongoing concern due to Mother's failure and/or inability to prevent these barriers going forward. In addition, Mother lacks appropriate housing and is unable to recognize any issues with the inappropriate suitable sleeping arrangements she suggested for the Children. It was noted that Mother was unable to demonstrate any notable progress since her last evaluation in developing the capacity to provide safety and permanency to her Children. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "f").

On April 4, 2016, ATA completed a PCE for Father and he continues to deny and minimize the concerns presented by DHS, and has demonstrated a pattern of superficial

4

compliance with his parental objectives. Father has the belief that engaging in a task asked of him is in itself completion of the task. Prior to reunification being considered, it is imperative that Father enroll in individual therapy and adhere to the identified treatment goals. Father does not present with the capacity to provide safety and/or permanency to his Children. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "g")

On April 20, 2016 and July 12, 2016, this Court held Goal Change/Termination Hearings and heard testimony on DHS's Petition to Terminate Father's Paternal Rights as to his four older Children, and Change the Permanency Goal to Adoption. On July 12, 2016, the parental rights of Mother and Father were involuntarily terminated as to their four children. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "h").

In response to the Order of July 12, 2016, terminating his parental rights, Father, by and through his counsel, filed Notices of Appeal with Statement of Matters Complained of on Appeal on July 22, 2016. On April 24, 2017 the Superior Court of Pennsylvania **AFFIRMED** this Court's Orders Involuntarily Terminating Father's Parental Rights to four Children: 2315 EDA 2016, 2316 EDA 2016, 2317 EDA 2016 and 2318 EDA 2016.

On September 15, 2017, DHS received a General Protective Services (GPS) Report which alleged Mother gave birth to this Child, C.C.R.; that Mother stated that all her Children had been placed in DHS' care; and that this Child born on August 31, 2017, weighed 4 pounds and 12 ounces, and was born at 30 weeks gestation. It was further alleged that Mother was not employed, that she denied drug or alcohol use, denied having

5

mental health issues, and stated that the Child's Father is involved in her care. This Report was determined to be valid. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "i").

On September 15, 2017, DHS visited Albert Einstein Medical Center (AEMC) and learned that the new born Child remained hospitalized and was being treated for a kidney disorder. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "j").

On September 15, 2017, DHS made a home visit, but no one answered the door. An unidentified adult male stated, from inside the family's apartment, that he would not permit DHS to enter the home without an appointment and stated that Mother could only meet with DHS if there was a scheduled appointment. A notification letter was left and a visit was scheduled for September 16, 2017, with the agreement of the adult male. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "k").

On September 16, 2017, DHS attempted a home visit; however, DHS could not gain access to the apartment complex. DHS telephoned Mother twice and Father once; however, neither parent answered the telephone. DHS left voicemail messages for them reminding them of the scheduled visits and asking them to contact DHS. DHS received no reply. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "l").

On September 20, 2017, DHS learned that Mother had visited the infant Child only three times since Mother was discharged from the hospital. DHS also learned that Mother was unable to diaper the infant properly during her visits and had to be helped by

6

Father. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "m").

On September 26, 2017, DHS attempted a home visit; however, DHS could not gain access to the apartment complex. DHS telephoned the parents; however, there was no answer and DHS left voicemail messages. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "n").

On September 28, 2017, DHS again telephoned the parents, but neither one answered the telephone. DHS left messages asking them to contact DHS. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "o").

On October 2, 2017, DHS made a home visit. An adult male answered the knock at the door but did not open the door. He refused to allow DHS into the home and speak to Mother without an appointment. He refused to allow DHS to schedule an appointment by leaving a notification letter at the home and insisted that the appointment must be scheduled via a mailed letter. The adult male refused to discuss the infant's care with DHS. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "p").

Mother has limited parenting skills and significant cognitive delays. Father has a history of substance abuse. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "q").

On October 10, 2017, C.C.R., was ready for discharge. DHS obtained an Order of Protective Custody (OPC) and the infant was placed in a foster home through The

7

Village. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "r").

A Shelter Care Hearing was held on October 12, 2017, before the Honorable Allan L. Tereshko. The Court lifted the OPC and legal custody of the Child transferred to DHS, and placement in Foster Care through The Village. The Child was born premature and has a cyst on her kidney. Parents have not been cooperative with DHS, and are ordered to fully cooperate with DHS by signing all medical releases. DHS to conduct a home assessment and appropriate clearances on all adults residing in the home within five days. (Shelter Care Order, 10/12/2017).

A hearing was held on November 16, 2017, and the case was continued because the adjudication hearing will be contested. Parents are to have supervised visits with the Child at the Agency. (Continuance Order, 11/16/2017)

On January 23, 2018, an Adjudicatory Hearing was held before the Honorable Allan L. Tereshko. The Child was adjudicated Dependent, and legal custody remained with DHS, and placement continued in Foster Care through The Village. Mother to have weekly supervised line of sight/hearing visits at the Agency for 2 hours and visitation may be modified by agreement of the parties. Parents to be notified of all of the Child's medical appointments. Parents referred to attend an amended PCE; referred Father to the Clinical Evaluation Unit (CEU) for a forthwith drug screen, assessment and three random drug screens prior to the next court date; referred Mother for out-patient therapy. (Order of Adjudication and Disposition, 1/23/2018).

On January 23, 2018, the Court found Aggravated Circumstances exist as to Mother and Father pursuant to 42 Pa.C.S. §6302(5). This Court ordered that efforts

8

continue to be made to preserve the family and reunify the Child with Mother and Father. (Aggravated Circumstances Order, 1/23/2018).

A Permanency Review Hearing was on April 19, 2018, before the Honorable Allan L. Tereshko. Legal Custody of the Child remains with DHS, and placement to continue in foster care through The Village. Visitation for the parents to remain supervised at the Agency. Parents were referred for parenting and family school. Parents to attend their PCE's. Father referred to the CEU for a forthwith drug screen, three random drug screens, assessment, and monitoring. The Parents are to continue to sign for the Child's medical releases. Mother to re-engage in Northwestern Human Services (NHS) for her mental health. (Permanency Review Order, 4/19/2018).

A Permanency Review Hearing was held on June 7, 2018, before the Honorable Allan L. Tereshko. Legal custody to remain with DHS, and placement to remain in Foster Care through The Village. Supervised visitation for parents is for two hours at the Agency. Parents to comply with their PCE and with all their Family Service Plan (FSP) objectives, services and recommendations. Mother referred to Behavioral Health Services (BHS) for consultation and evaluation; Father referred back to the CEU for assessment, forthwith drug and alcohol screen and three random drug and alcohol screens prior to the next court date. Parents were discharged from Family School due to lack of participation. Child is safe as of 5/23/2018. (Permanency Review Order, 6/07/2018).

On June 12, 2018, ATA completed a PCE for Mother, and she was diagnosed with Intellectual Disability, Mild, as she is functioning in the borderline range of intelligence. At the time of the current evaluation, Mother continued to minimize the reasons that her parental rights were terminated for her other children and their ultimate

9

adoption. Mother has demonstrated a pattern of limited insight which combined with cognitive limitations raises concern with her ability to be responsive to the overall ability to anticipate and plan for the multiple issues that arise in caring for a young child and, specifically, the medical needs of the child. C.C.R., is diagnosed with kidney dysplasia and neurofibromatosis, which requires ongoing medical care, monitoring and responsiveness. Should the Child display any medical concerns, she must be brought to the emergency room immediately. There are concerns that Mother will not be as vigilant with the Child's medical needs as she needs to be. This concern is reinforced by Mother's lack of knowledge regarding the Child's condition. At the time of the evaluation, Mother was unable to identify the Child's diagnosis and what services she is receiving. The additional concern was expressed regarding Father's ongoing noncompliance with DHS and the case objectives necessary for reunification. Parents maintain a relationship and reside together. Father's lack of compliance and efforts towards reunification, poses a risk to the Child due to his presence in the home. It was opined that Mother does not present with the capacity to provide safety and permanency to the Child and it is unlikely she will develop the capacity to do so in a timely manner. It was recommended that Mother engage in individual therapy to assist her in addressing her reported mood symptoms, including depression and irritability. She should be supported in developing insight into the reasons that her children are not in her care and processing her associated emotions in a therapeutic setting. Mother should participate in available programming to help her develop an understanding of the Child's medical needs and caring for those identified medical needs. It was further recommended that an intensive case manager should be appointed to assist Mother, and her DHS worker and/or therapist

10

should aid her in obtaining services if qualified from the Department of Intellectual Disabilities. Visits with the Child should remain supervised and unsupervised visitation should not be considered until progress has been made towards these recommendations. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "x").

On August 24, 2018, DHS held a Family Service Plan (FSP) Meeting. The goal identified for the Child was adoption. The parental objectives established for Father were to: 1) attend CEU for evaluation and dual diagnosis, and follow the recommendations of the provider, 2) sign authorizations for obtaining information of progress, medications and attendance, 3) attend visitations with the Child to improve relationship, 4) attend the Child's medical appointments and follow up with agency provider and 5) sign consents for the Child. Parents participated in the Meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 11/20/2018, ¶ "y").

A Permanency Review Hearing was held on September 6, 2018, before the Honorable Allan L. Tereshko. Legal custody of the Child remained with DHS, and placement continued in Foster Care through The Village. Father to comply with the CEU recommendations and a Parenting Capacity Evaluation (PCE). The Court re-referred Father to the CEU for a forthwith drug and alcohol screen, assessment, dual diagnosis, monitoring and three random drug and alcohol screens prior to next court date. The Court re-referred Mother and Father to Family School and ordered them to comply with all services and recommendations. The Court permitted continuing weekly supervised

11

visits for Mother and Father as arranged by the parties. Child was safe as of 9/04/2018. (Permanency Review Order, 9/06/2018).

A Permanency Review Hearing was held on December 6, 2018, before the Honorable Allan L. Tereshko. Legal custody of the Child remained with DHS, and placement continued in Foster Care through The Village. Mother and Father reside together, and Father is employed. Father's visitation is supervised weekly at the Agency. He was offered 13 visits with the Child, he missed 3 visits. Mother and Father refused to sign subpoenas for next court date. Child was safe as of 11/20/2018. (Permanency Review Order, 12/06/2018).

## TERMINATION HEARING

A Goal Change, Involuntary Termination hearing was held on February 7, 2019, before the Honorable Allan L. Tereshko. Michael Pratt, Esquire, ACS for DHS, presented Barbara Forrest, Social Worker for DHS, as the first witness. She testified she is the Case Manager, and the Child came into care after she was born prematurely on 8/31/2017, had difficulty feeding, diagnosed with a kidney disorder, and Mother needed assistance in changing her. On October 10, 2017, when the Child was ready for discharge, DHS obtained an Order of Protective Custody (OPC) and the infant was placed in a Foster Home through The Village. (N.T., 2/07/2019, p.6 at 17-25; p.7 at 1-4).

Ms. Forrest testified the Child was adjudicated Dependent on 1/23/2019, and also an Aggravated Circumstances Order was entered for Mother and Father based on a previous involuntary termination of parental rights. C.C.R., was never in the care of

12

either Mother or Father, and she was placed in Foster Care directly from the hospital. (N.T., 2/07/2019, p.7 at 4-18; p.8 at 2-7).

Ms. Forrest further testified DHS held Family Service Plan (FSP) Meetings and one of the objectives for the parents was to attend Family School. After 30 days of unsuccessful contact, both parents were discharged from the programs in June 2018, and they have not re-engaged. Another objective was for parents to attend medical appointments because the Child has medical issues that need to be addressed on a daily basis. At visitation, once a week at the Agency, the parents were informed that the 18 month old Child had difficulty swallowing and chewing and required soft foods, and the parents brought in food that was inappropriate. Another objective for Father was to obtain an updated Parenting Capacity Evaluation, however Father has refused to attend, and is not engaged at all. Another objective was to have Father present at CEU for drug screens and assessments, and again Father has refused to undergo drug screens. Another objective for Father was parenting class, and again, Father has refused to attend. (N.T., 2/07/2019, p.9 at 6-25; p.10 at 1-8; p.11 at 9-25; p.12 at 1-25; p.13 at 1-25).

Regarding Father's attendance at the Child's medical appointments, Father did not show up. Ms. Forrest noted that his non-attendance is critical because the Child's medical issues are such that the caregiver must be aware of everything surrounding the Child. Her immune system is week and any sign of stress must be taken care of. She noted that reunification between the Child and the parents has been ruled out by DHS because of the aggravated circumstances and also the concerns about the Child's medical needs and her safety. Ms. Forrest opined that the Child would not suffer irreparable harm if Father's parental rights were terminated because Father is not engaged. He does not

13

attend the appointment nor the visits because he is working, and does not give the Child's medical issues a priority. (N.T., 2/07/2019, p.13 at 22-25; p.14 at 1-20; p.15 at 9-21).

Ms. Forrest testified the Child has been with the Foster Parent, B.W., since October of 2017, and it is the pre-adoptive home. She has observed interactions between the Child and the Foster Mother, and she is bonded and happy with B.W. The Child has a parent-child relationship with her Foster Mother, and she gets upset when B.W., leaves the room. The Child is medically up to date and that includes treatment for kidney dysplasia, 17Q deletion disorder, and neurofibromatosis. The Child is in daycare and receives specialized services for speech therapy. She is linked with a neonatal intensive care unit specialist, and may require autism testing as she gets older. (N.T., 2/07/2019, p.15 at 22-25; p.16 at 1-25; p.17 at 1-25).

Ms. Forrest stated the Child is safe with all of her needs being met with the Foster Mother. She further opined it would be in the Child's best interest to be adopted by B.W., because the Child is bonded with her, and the Foster Mother attends to all of the Child's current medical issues in a competent manner. (N.T., 2/07/2019, p.18 at 1-16).

Dr. William Russell, an Expert in Forensic Psychology and Parenting Capacity, was the next witness to testify. All parties stipulated to find Dr. Russell as an Expert. He testified he completed a Parenting Capacity Evaluation and Report on Father on July 15, 2014, and a second updated one on April 14, 2016. He noted that he recommended Father participate in drug and alcohol treatment with random urine screens. He also noted that it would raise a red flag if Father refused to present for screening because if Father is trying to present himself as capable of providing safety and permanency to a child, that the person is not complying with objectives that are recommended is a red

14

flag. Another recommendation he made was for Father to enroll in individual therapy to adhere to the identified treatment goals to help him address his longstanding pattern of aggression across settings, identify his role in his Children's removal and placement, as well as, help him develop insight into the impact it has on his Children. Father tended to minimize any difficulties that his Children had and believed they did not have disorders or disabilities. (N.T., 2/07/2019, p.38 at 4-25; p.45 at 18-25; p.46 at 1-25; p.47 at 1-22).

Dr. Russell testified it would be important for Father to develop a comprehensive understanding of C.C.R.'s disorder, how it manifests itself, and the variation of that would be critical to providing safety for the Child. So Father must communicate with treatment providers and attend the medical appointments, and failure to do that raises a question as to his efforts to keep his daughter safe. At the time of the evaluation, Dr. Russell determined that Father lacks the capacity of providing safety for his Child. (N.T., 2/07/2019, p.48 at 2-25; p.49 at 1-5).

When questioned by Katherine Knese, Esquire, the Child Advocate, Dr. Russell testified that the Father's response to his older four Children's special needs and treatment was to minimize the difficulties that he faced in raising those Children. And in an effort to have the parents gain an understanding of the difficulties they participate in 10 supervised therapeutic visits at his agency. Dr. Russell supervised the therapist who conducted the visits and also read all of the reports. The lack of understanding on the part of the parents as to why the Children came into care effects their ability to integrate any feedback into their parenting skills. That is crucial because C.C.R., now presents with more special needs than any of the other Children, and there has not been any significant change in those same areas and that is very concerning. The parents were

15

receptive to the verbal feedback, however, how much they incorporated into their visits was very limited. (N.T., 2/07/2019, p.51 at 12-25; p.52 at 1-25; p.53 at 1-21).

Arielle Fonrose, Social Worker at The Village, was the next witness to testify. She stated she is responsible for scheduling and maintaining logs of the Child's medical appointments from November 2017, to the present. Ms. Fonrose stated the log indicates approximately 32 medical appointments during this period of time. She testified this log indicates Mother attended six out of 32 medical appointments, and Father attended one, which both parents attended on 6/23/2018, because he could not leave work. Since 6/23/2018, the Child has had numerous medical appointments that the parents did not attend. She further testified that she discussed dietary restrictions with Father, and the requirement that the foods must be soft because the Child has difficulty swallowing. However, during a visit immediately after this warning was given to Father, he brought the Child a meal that she thought was inappropriate. (N.T., 2/07/2019, p.55 at 6-25; p.56 at 1-25; p.57 at 8-25; p.58 at 1-25; p.59 at 1-15).

Father was the next witness to testify. He stated he could not attend Family School because he works from 7:00 a.m. until 3:00 p.m. and has another job. Father noted that he had completed anger management and parenting class during the period that his four older Children were under court supervision. He admitted he cannot attend medical appointments for C.C.R., because of his work schedule also. Father stated he now has appropriate housing and has attended all of the visits with his Child, along with the Mother. Father testified that C.C.R., is a healthy child, and the hospital gave him and Mother instructions on how to take care of her kidney disorder, you have to monitor the situation basically. The Child does not have autism. (N.T., 2/07/2019, p.62 at 4-25;

16

p.63 at 1-25; p.64 at 1-13).

On cross-examination by Mr. Pratt, attorney for DHS, Father agreed it is important to attend all of the Child's medical appointments, however, his job needs him and he cannot make the appointments, but the Mother attends all of the appointments. When asked why Mother only attended 6 out of 32 appointments, Father responded that most of those appointments were emergencies where the Foster Mother had to rush her to the hospital when she got sick. They could not get to hospital emergency rooms unless they were told which hospital. He noted that the Foster Mother told them about all of the emergency visits. Father acknowledged that C.C.R., has cognitive, developmental issues and medical issues. However, Father believes she is a normal healthy child because when he sees her at visits she plays and talks and appears normal. (N.T., 2/07/2019, p.64 at 16-25; p.65 at 1-25; p.66 at 1-4; p.68 at 1-25; p.69 at 1).

Ms. Fonrose was recalled to the witness stand by Mr. Pratt and testified that out of the 32 medical visits for the Child, 7 or 8 were emergency visits to the hospital. (N.T., 2/07/2019, p.69 at 7-17).

## STANDARD OF REVIEW AND LEGAL ANALYSIS

When reviewing an appeal from a decree terminating parental rights, an appellate Court is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference that it would give to a jury

17

verdict. The Pennsylvania Superior Court need only agree with a trial court's decision as to any one subsection under 23 P.C.S.A. §2511 (a) in order to affirm a termination of parental rights. *In re D.A.T.* 91 A.3d 197 Pa.Super.2014).

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. In re T.S.M., 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations and quotation marks omitted) In re Adoption of C.D.R., 2015 PA Super 54, 111 A.3d 1212, 1215 (2015).

This Child became known to DHS on September 15, 2017, when DHS received a General Protective Services (GPS) Report which alleged Mother gave birth to this Child, C.C.R.; that Mother stated that all her children had been placed in DHS' care; and that this Child born on August 31, 2017, weighed 4 pounds and 12 ounces, and was born at 30 weeks gestation. It was further alleged that Mother not employed, that she denied drug or alcohol use, denied having mental health issues, and stated that the Child's Father is involved in her care. On September 15, 2017, DHS visited Albert Einstein Medical Center (AEMC) and learned that the new born Child remained hospitalized and was being treated for a kidney disorder. On September 20, 2017, DHS learned that Mother had visited the infant Child only three times since Mother was discharged from the

18

hospital. DHS also learned that Mother was unable to diaper the infant properly during her visits and had to be helped by Father. Mother has limited parenting skills and significant cognitive delays. Father has a history of substance abuse. On October 10, 2017, C.C.R., was ready for discharge. DHS obtained an Order of Protective Custody (OPC) and the infant was placed in a Foster Home through The Village.

## The Trial Court Properly Found that DHS had met its Burden by Clear and Convincing Evidence to Terminate Father's Parental Rights Pursuant to 23 Pa.C.S.A. §2511(a)(1), (2), and 2511 (b) [1]

Involuntary termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. As the party petitioning for termination of parental rights, DHS "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.*, 465 A.2d 642, 644 (Pa. 1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203-04 (Pa.1989).

---

[1] **23 Pa.C.S.A. §2511 (a) General Rule.**—the rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parenting claim to a child or has refused or failed to perform parental duties. (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

**23 Pa.C.S.A. §2511 (b). Other Considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

Termination of parental rights is governed by Section 2511 of the Adoption Act 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super.2007) (citations omitted). In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1049-50 (2015). The Court need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1050 (2015).

Father challenges the involuntary termination of his parental rights based on the trial court's abuse of discretion in that its judgment was based on bias—having previously involuntarily terminated Father's rights to C.R.'s siblings. This Court disagrees and found that clear and convincing evidence was presented by DHS under 23 PA.C.S.A. §2511(a)(1), and (2) to terminate Father's parental rights as to the Child, C.C.R.

This Court heard credible, persuasive evidence from Barbara Forrest, DHS Case Manager. She testified that C.C.R., was born premature on 8/31/2017, had difficulty feeding and was diagnosed with a kidney disorder. The Child required hospitalization

and assistance, Mother also required assistance in changing the Child's diaper. An OPC was obtained for the Child on 10/10/2017, when the Child was ready to be released, and she was placed in Foster Care directly from the hospital. The Child was adjudicated dependent on 1/28/2018, and on that date there was also an Aggravated Circumstances Order finding as to Mother and Father because four older children had been under DHS supervision and the parent's rights had been involuntarily terminated.

Ms. Forrest further testified DHS held Family Service Plan (FSP) Meetings and one of the objectives for the parents was to attend Family School. After 30 days of unsuccessful contact, both parents were discharged from the programs in June 2018, and they have not re-engaged. Another objective was for parents to attend medical appointments because the Child has medical issues that need to be addressed on a daily basis. At visitation, once a week at the Agency, the parents were informed that the 18 month old Child had difficulty swallowing and chewing and required soft foods, and the parents brought in food that was inappropriate. Another objective for Father was to obtain an updated Parenting Capacity Evaluation, however Father has refused to attend, and is not engaged at all. Another objective was to have Father present at CEU for drug screens and assessments, and again Father has refused to undergo drug screens. Another objective for Father was parenting class, and again, Father has refused to attend.

Regarding Father's attendance at the Child's medical appointments, Father did not show up. Ms. Forrest noted that his non-attendance is critical because the Child's medical issues are such that the caregiver must be aware of everything surrounding the Child. Her immune system is weak and any sign of stress must be taken care of. She noted that reunification between the Child and the parents has been ruled out by DHS

21

because of the aggravated circumstances and also the concerns about the Child's medical needs and her safety. Ms. Forrest opined that the Child would not suffer irreparable harm if Father's parental rights were terminated because Father is not engaged. He does not attend the appointments nor the visits because he is working, and does not give the Child's medical issues a priority.

Ms. Forrest testified the Child has been with the Foster Parent, B.W., since October of 2017, and it is the pre-adoptive home. She has observed interactions between the Child and the Foster Mother, and she is bonded and happy with B.W. The Child has a parent-child relationship with her Foster Mother, and she gets upset when B.W., leaves the room. The Child is medically up to date and that includes treatment for kidney dysplasia, 17Q deletion disorder, and neurofibromatosis. The Child is in daycare and receives specialized services for speech therapy. She is linked with a neonatal intensive care unit specialist, and may require autism testing as she gets older. Ms. Forrest stated the Child is safe with all of her needs being met with the Foster Mother. She further opined it would be in the Child's best interest to be adopted by B.W., because the Child is bonded with her, and the Foster Mother attends to all of the Child's current medical issues in a competent manner.

This Court heard clear and convincing credible testimony from Dr. William Russell, an Expert in Forensic Psychology and Parenting Capacity. He testified he completed a Parenting Capacity Evaluation and Report on Father on July 15, 2014, and a second updated one on April 14, 2016. He noted that he recommended Father participate in drug and alcohol treatment with random urine screens. He also noted that it would raise a red flag if Father refused to present for screening because if Father is trying to

22

present himself as capable of providing safety and permanency to a child, that the person is not complying with objectives that are recommended is a red flag. Another recommendation he made was for Father to enroll in individual therapy to adhere to the identified treatment goals to help him address his longstanding pattern of aggression across settings, identify his role in his children's removal and placement, as well as, help him develop insight into the impact it has on his children. Father tended to minimize any difficulties that his children had and believed they did not have disorders or disabilities.

Dr. Russell further testified it would be important for Father to develop a comprehensive understanding of C.C.R.'s disorder, how it manifests itself, and the variation of that would be critical to providing safety for the Child. So, Father must communicate with treatment providers and attend the medical appointments, and failure to do that raises a question as to his efforts to keep his daughter safe. When questioned by Katherine Knese, Esquire, the Child Advocate, Dr. Russell testified that the Father's response to his older four Children's special needs and treatment was to minimize the difficulties that he faced in raising those Children. And in an effort to have the parents gain an understanding of the difficulties, they participate in 10 supervised therapeutic visits at his agency. Dr. Russell supervised the therapist who conducted the visits and also read all of the reports. The lack of understanding on the part of the parents as to why the Children came into care effects their ability to integrate any feedback into their parenting skills. That is crucial because C.C.R., now presents with more special needs than any of the other Children, and there has not been any significant change in those same areas and that is very concerning. The parents were receptive to the verbal feedback, however, how much they incorporated into their visits was very limited.

23

This Court also heard credible testimony from Arielle Fonrose, Social Worker at The Village. She stated she is responsible for scheduling and maintaining logs of the Child's medical appointments from November 2017 to the present. Ms. Fonrose stated the log indicates approximately 32 medical appointments during this period of time, and that Mother attended six out of 32 medical appointments, and Father attended one, which both parents attended on 6/23/2018, because he could not leave work. Since 6/23/2018, the Child has had numerous medical appointments that the parents did not attend. She further testified that she discussed dietary restrictions with Father, and the requirement that the foods must be soft because the Child has difficulty swallowing. However, during a visit immediately after this warning was given to Father, he brought the Child a meal that she thought was inappropriate.

This Court's decision to terminate Father's parental rights to the Child was based on clear and convincing evidence which established that Father's conduct for at least the six months prior to the filing of the petition to terminate, revealed a settled purpose relinquishing parental claim to the Child and revealed a failure to perform parental duties. This Court found the evidence supported that conclusion that Father lacks the present and future capacity to provide parental care, control or subsistence necessary for the Child's physical and mental well-being. Father cannot provide for the Child's basic needs nor can he provide a structured environment for this one and one-half year old Child.

This Court found that DHS proved by clear and convincing evidence that Father is incapable of providing safety and permanency for her Child now and in the future. This Court is not persuaded that Father can or will remedy the conditions which continue to exist and which brought the Child into supervision. Based on the clear and convincing

24

evidence presented, this Court terminated Father's parental rights pursuant to 23 PA.C.S.A. §2511(a) (1), and (2).

After the Court finds that the statutory grounds for termination have been satisfied, it must then determine whether the termination of parental rights serves the best interests of the child pursuant to 2511(b) In re Adoption of C.L.G., 956 A2d 999 (Pa.Super 2008). In terminating the rights of a parent, the Court "shall give primary consideration to the development, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. §2511(b). One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child. *In re T.S.M., 71 A3d 251 (Pa. 2013).*

In making this determination, the Court must carefully examine both the tangible and intangible dimension of the needs and welfare of the Child. The tangible dimension of a Child's needs involves providing for the physical necessities of life. The intangible dimension of the parent-child relationship involves the consideration of the love, closeness, comfort and security shared, the emotional bond that may or may not exist between the parent and the Child and the likely effect termination of parental rights will have on the Child. *In re: Involuntary Termination of C.W.S.M. and K.A.L.M., 839 A.2d 410 (Pa.Super. 2003).*

Testimony by Ms. Forrest, the Case Manager provided credible, persuasive testimony regarding the Child's physical and emotional needs, best interests and with whom the Child has a parental bond. She noted the Child has been in care with the Foster Mother since she was born, and she has observed the interaction between the Child and the Foster Mother. She states the Foster Parent cares for all of the Child's physical,

25

emotional and medical needs, which are paramount. It is her opinion that the Child would not suffer irreparable harm if Father's parental rights were terminated because there is no parental bond and Father has minimal contact with the Child, and it would be in the Child's best interests to be adopted.

Here, the totality of the evidence supports the Court's conclusion that termination of Father's parental rights is in the best interest of the Child. This Court found that termination of Father's parental rights met the developmental, physical and emotional needs and welfare of the Child, and the statutory requirements for involuntary termination of his parental rights were met pursuant to 23 Pa.C.S.A. §2511(b).

## CONCLUSION

At the conclusion of the Hearing, the Court stated:

The record before this Court presents a factually clear convincing issue that the parents lack the capacity to care for this child and have not taken advantage of all of the services and efforts that the Department has extended. And this goes back, and the history is supplemented further by the prior history in which the parents have engaged—or lack—failed to engage all of the service providers and engage with all of the services that were offered to them to help care for this child.

And I believe that there's a fundamental lack of appreciation of the needs of this child. And faced with that lack of appreciation of the needs of this child, neither parent would be able to provide the necessary safety or care for this child. Given the fact that she has had so many medical visits, she's had so many ER visits, both parents have maintained an unavailability to participate in the care of this child. That will not change. I don't believe the parents will ever demonstrate an ability to care for this child.

There's some differences in the testimony. But the—all in all—I don't believe that there was a great conflict. I think the caseworker testified and her testimony is given great weight and credibility. She's been on this case from the beginning. Dr. Russell knows the Mother and the Father well. And it's his considered expert opinion

26

that they lack the capacity to care for this child. Because the child was not in the parents care when the child was brought into care, sections (5) and (8) are not satisfied. But sections (1) or (2) are satisfied that the parents have failed to remedy the issues that brought this child into care and will not ever be able to remedy those issues going forward.

So the rights are terminated pursuant to 2511 (a) (1) and (2). Further, the child has been in care since birth, been in care with the same placement resource, has developed a parental relationship with the resource, and does not have a parental relationship with either Mother or Father. The testimony that there would be no irreparable harm is credible and is given weight by this court. The court finds there would be no irreparable harm if parents' rights were terminated and that it would be in the best interest of the child to move this goal to adoption, which the Court now does. So, in recap, rights are terminated pursuant to 2511 (a) (1) and (2) by clear and convincing evidence. 2511 (b) is satisfied by clear and convincing evidence. Rights are terminated and goal is changed to adoption.

For the foregoing reasons, this Court respectfully requests that the Decree and Order of February 7, 2019, terminating Father, C.D.R., Sr.'s Parental Rights to the Child, C.C.R. and Changing the Permanency Goal to Adoption, be AFFIRMED.

**BY THE COURT:**

**ALLAN L. TERESHKO, Sr. J.**

5-16-19

**DATE**